**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------X
CRYSTAL MCKINNEY,

                                Plaintiff,         **Index No.** 24-cv-03931

                - against -


SEAN COMBS a/k/a "P.DIDDY," BAD BOY
ENTERTAINMENT LLC d/b/a BAD BOY RECORDS,
BAD BOY ENTERTAINMENT HOLDINGS, INC.,
SEAN JOHN CLOTHING LLC, and DADDY'S HOUSE
RECORDINGS, INC.,

                                Defendants.
----------------------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

**PHILLIPS & ASSOCIATES**
**ATTORNEYS AT LAW, PLLC**
Michelle Caiola, Esq.
Jonathan Goldhirsch, Esq.
45 Broadway, 28th Floor
New York, New York
10006 (212) 248-7431
mcaiola@tpglaws.com
jgoldhirsch@tpglaws.com
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ i

I.    PRELIMINARY STATEMENT ........................................................................... 2

II.   FACTUAL ALLEGATIONS ................................................................................ 2

   A.  Plaintiff Is Invited To A Fashion Show To Meet Combs ................................. 2

   B.  Combs Makes Promises of Career Advancement ............................................ 3

   C.  Plaintiff Meets Combs At His Studio Where He Drugs And Sexually Assaults Her ............. 3

   D.  Combs' Assault Has Caused Plaintiff Lifelong Harm ..................................... 5

   E.  Corporate Defendants Are Liable For Combs' Behavior ................................ 6

III.  LEGAL STANDARD ........................................................................................... 7

IV.   ARGUMENT ........................................................................................................ 7

   A.  Relevant History of the GMVA, CVA, And ASA ............................................ 8

   B.  Defendants Fail to Address Controlling Precedent ......................................... 9

   C.  There is No Evidence That the State Intended to Preempt the GMVA and It Has Not Set
       Out a Statutory Scheme To Do So ................................................................ 9

   D.  There Is No Conflict As The GMVA Furthers the Same Goals As the CVA and ASA ......... 11

   E.  The Corporate Defendants Are Liable Because the GMVA's 2022 Amendment Is Applied
       Retroactively .............................................................................................. 13

   F.  The Corporate Defendants Are Liable Because They Enabled Combs' Sexual Assault ....... 16

V.    CONCLUSION ................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Albany Area Builders Ass'n v. Guilderland*, 74 N.Y.2d 372 (1989)................................................ 11

*Bayview Loan Servicing, LLC v. Dalal,* 2024 N.Y. App. Div. LEXIS 6154 (App. Div. 1st Dep't,
    Nov. 19, 2024)............................................................................................................. 14

*Bensky v. Indyke,* 2024 U.S. Dist. LEXIS 138140 (S.D.N.Y. Aug. 05, 2024) ............................ 15

*Bellino v. Tallarico,* 2024 U.S. Dist. LEXIS 56345 (S.D.N.Y. Feb. 21, 2024)...................... 12, 15

*Breest v. Haggis*, 180 A.D.3d 83 (App. Div. 2019, 1st Dep't)........................................................ 8

*Brown v. Univ. of Rochester*, 216 A.D.3d 1328 (App. Div. 3d Dept. 2024) ................................ 16

*Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 184 A.D.3d 197 (App. Div., 1st Dep't 2020)
    .................................................................................................................................. 12

*Doe v. Black,* 2024 U.S. Dist. LEXIS 175929 (S.D.N.Y. Sep. 27, 2024) ........................ 10, 11, 12

*Doe v. Gooding,* 2022 U.S. Dist. LEXIS 68607 (S.D.N.Y. Apr. 13, 2022) ..................... 10, 11, 12

*Doe v. Wilhelmina Models, Inc.,* 229 A.D.3d 128 (App. Div., 1st Dept 2024) ............................. 8

*Doyon v. U.S.*, 58 F.4th 1235 (Fed. Cir. 2023) ........................................................................... 13

*Druger v. Syracuse Univ.*, 207 A.D.3d 1153 (App. Div. 4th Dept. 2022)..................................... 16

*Engelman v. Rofe,* 194 A.D.3d 26 (App. Div. 1st Dep't 2021) ................................................. 9, 10

*Graves v. Combs, et. al.*, 1:24-cv-07201 (S.D.N.Y., filed Sept. 24, 2024) ................................. 19

*Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005) ................... 13

*Jane Doe v. Sean Combs, et. al.*, 23-cv-10628 (S.D.N.Y., filed Mar. 29, 2024)......................... 19

*Lampros v. Combs, et. al.*, 15489/2024 (Sup. Ct. N.Y. Cnty. May 23, 2024).............................. 19

*Louis v. Niederhoffer,* 2023 U.S. Dist. LEXIS 227003 (S.D.N.Y. Dec. 19, 2023) ..................... 15

*Matter of Gleason*, 96 N.Y.2d 117 (2001)............................................................................. 13, 14

*Matter of NYP Holdings, Inc. v. N.Y.C. Police Dep't*, 220 A.D.3d 487 (App. Div. 1st Dep't 2023)
    .................................................................................................................................. 14

*Moore Charitable Found. v. PJT Partners, Inc.,* 40 N.Y.3d 150 (2023) ..................................... 16

*Mujo v. Jani-King Int'l*, 13 F.4th 204 (2d Cir. 2021) ..................................................................... 7

*Napoli-Bosse v. GM LLC,* U.S. App. LEXIS 30073 (2d Cir. Nov. 13, 2023)................................ 7

*Nelson v. HSBC Bank USA*, 87 A.D.3d 995 (App. Div. 2d Dep't, 2011)..................................... 14

*Ormond v. Weinstein,* 2024 N.Y. Misc. LEXIS 22470 (Sup. Ct. N.Y. Cnty. Aug. 19, 2024)........ 18

*People v. Brown,* 25 N.Y.3d 247 (2015) ...................................................................................... 12

i

*Police Benevolent Ass'n of the City of N.Y., Inc. v. City of N.Y.*, 40 N.Y.3d 417 (NY 2023) .......... 9

*Schafer v. Direct Energy Servs., LLC*, 845 F. App'x 81 (2d Cir. 2021)........................................ 7

*Stein v. Rockefeller Univ. Hosp.*, 2024 NYLJ LEXIS 1662 (Sup. Ct. N.Y. Cnty. May 23, 2024).. 8

*Terrance v. City of Geneva*, 799 F. Supp. 2d 250 (W.D.N.Y. 2011)............................................... 11

*U.S. Bank v. Lynch,* 2024 N.Y. App. Div. LEXIS 5578 (App. Div., 3d Dep't, Oct. 24, 2024) ..... 14

*Ventura v. Combs*, 23-cv-10098 (S.D.N.Y., filed Nov. 16, 2023) ................................................. 19

*Walker v. Schult*, 717 F.3d 119 (2d Cir. 2013)................................................................................. 7

*Zhang v. Centene Mgmt. Co.,* 2023 U.S. Dist. LEXIS 68718 (E.D.N.Y. Feb. 2, 2023).............. 15

**Statutes**

2021 N.Y.S.B. 66 (NS)..................................................................................................................... 9

C.P.L.R. § 214-j ........................................................................................................................... 7, 8

C.P.L.R. § 214-j ........................................................................................................................... 9

C.P.L.R. § 214-g ........................................................................................................................... 7, 8

C.P.L.R. § 215(3) ........................................................................................................................... 9

New York City, Local Law Report No. 2372-2021 (2021)............................................................ 14

New York City, Local Law Report No. 752-A (2000) ................................................................... 14

N.Y.C. Admin. Code § 10-1103 .................................................................................................... 8

N.Y.C. Admin. Code § 10-1104 ................................................................................................ 13,16

N.Y.C. Admin. Code § 8-901 ........................................................................................................ 1

**Other Authorities**

Diane Piappert, *2024 Barbara Blaine Trailblazer Award Recipient – NY State Senator Brad Hoylman-Sigal*, CHILDUSA (Oct. 15, 2024) .......................................................................... 13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

CRYSTAL MCKINNEY,

                             Plaintiff,

            - against -

SEAN COMBS a/k/a "P. DIDDY," BAD BOY
ENTERTAINMENT LLC d/b/a BAD BOY
RECORDS, BAD BOY ENTERTAINMENT
HOLDINGS, INC., SEAN JOHN CLOTHING LLC,
and DADDY'S HOUSE RECORDINGS, INC.,

                             Defendants.

---------------------------------------------------------------------X

Index No: 24-3931

**PLAINTIFF'S**
**MEMORANDUM OF**
**LAW IN OPPOSITION**
**TO DEFENDANTS'**
**MOTION TO DISMISS**

      Plaintiff CRYSTAL MCKINNEY ("Plaintiff"), by and through her attorneys, PHILLIPS & ASSOCIATES, PLLC, respectfully submit this Memorandum of Law in Opposition to Defendants' SEAN COMBS a/k/a "P. DIDDY," BAD BOY ENTERTAINMENT LLC d/b/a BAD BOY RECORDS, BAD BOY ENTERTAINMENT HOLDINGS, INC, (collectively Bad Boy Entertainment LLC and Bad Boy Entertainment Holdings, Inc. hereinafter referred to as "Bad Boy"), SEAN JOHN CLOTHING LLC ("Sean John"), and DADDY'S HOUSE RECORDINGS INC ("Daddy's House") (Bad Boy, Sean John, and Daddy's House, are collectively referred to as "Corporate Defendants") Motion to Dismiss Plaintiff's Amended Complaint ("AC," ECF No. 19). In her Amended Complaint, Plaintiff alleges that Defendants violated the Victims of Gender-Motivated Violence Prevention Act ("GMVA"), N.Y.C. Admin. Code § 8-901 *et. seq.*, causing her lifelong injuries she has suffered as a result of being drugged and sexually assaulted by Defendant Sean Combs.

1

## I.  PRELIMINARY STATEMENT

On May 21, 2024, Plaintiff filed suit against Defendants pursuant to the GMVA alleging that Defendant Combs involuntary drugged and sexually assaulted her on company premises and in view of Bad Boy employees. (ECF No. 1).[1] In the aftermath of the assault, Plaintiff suffered lasting damage to her career, mental health, and personal relationships.

Defendants hope to make this lawsuit disappear by filing a Motion to Dismiss. In Defendants' effort to dismiss this suit, they put forth inaccurate and unsupported factual and legal claims. In arguing that Plaintiff's claims are preempted by state law, Defendants ignore controlling Appellate Division precedent and rely on outlier District Court decisions to make specious legal arguments. Defendants further make the untenable argument that Corporate Defendants were not aware of Defendant Combs' propensity for sexual violence, however, Combs' abuse was so open and notorious that Corporate Defendants cannot credibly claim that they did not know (or should not have known) of his frequent illegal conduct against women. As set out below, all of the aforementioned arguments should fail.

Plaintiff's suit was filed seven months ago, is of great significance in allowing her to vindicate her civil rights, and in the interest of justice, should be able to proceed without further delay.

## II.  FACTUAL ALLEGATIONS

### A.  **Plaintiff Is Invited To A Fashion Show To Meet Combs**

Plaintiff began her modeling career at age seventeen, which lead to her being featured in clothing catalogs, fashion magazines, as well as television and film programs. (AC ¶ 34-39). In or

---

[1] The operative complaint for purposes of this Motion to Dismiss is an Amended Complaint filed on August 1, 2024. (ECF No. 19).

about February 2003, when Plaintiff was twenty-two years old, a fashion designer invited Plaintiff to attend the Sean John Fashion show. (AC ¶ 40). Prior to the event, the Designer told Plaintiff that he would be introducing her to Combs, so he could help advance her modeling career. (AC ¶ 42). The Designer directed Plaintiff's physical appearance and styled her clothing to ensure Combs found her attractive. (AC ¶ 43-47). Due to the traumatic events that would follow, Plaintiff saved the clothing from that night in her closet where they remain. (AC ¶ 47).

### B. **Combs Makes Promises of Career Advancement**

At the Fashion Show, Plaintiff was forced to sit next to Defendant Combs, who made a public display of coming onto her in a sexually suggestive manner. (AC ¶ 50-51). Combs bestowed Plaintiff with compliments and promised that he would help advance her career before providing his phone number. (AC ¶ 52-54). Throughout their interactions, Combs was flirtatious, bordering on leering, as he leaned across the table towards her. (AC ¶ 56). Combs also plied Plaintiff with alcohol throughout the dinner as he repeatedly refilled her glass with wine. (AC ¶ 57). After the meal ended, Combs told Plaintiff that he wanted to get to know her better. (AC ¶ 58). Combs asked Plaintiff to call him a bit later. (AC ¶ 59). Plaintiff felt confused but hopeful that Combs would fulfill his promises to help her career. (AC ¶ 60).

### C. **Plaintiff Meets Combs At His Studio Where He Drugs And Sexually Assaults Her**

Later that night, Combs requested Plaintiff come see his studio, Daddy's House, located at 321 W. 44th Street, New York, NY 10036. (AC ¶ 61). Plaintiff felt reassured that she would be with others at the studio rather alone in a personal residence. (AC ¶ 63). When Plaintiff arrived in the Demo Room, she found that Combs and several other men seated together. (AC ¶ 64). The men were Bad Boy employees and/or other industry professionals who were working on *One Love,* a New Edition album. (AC ¶ 65).

3

Plaintiff found that the men were passing around a bottle of Hennesy and joints. (AC ¶ 66). After Plaintiff sat down, one of Combs' associates asked her: "Do you smoke weed?", to which she responded affirmatively.  (AC ¶ 67). Combs' associate replied: "You've never had weed like this before."  (AC ¶ 68).

Plaintiff later came to understand that Combs had laced the joint with a narcotic or other intoxicating substance. (AC ¶ 69). Combs passed her the joint and Plaintiff took a hit, which felt very powerful.  (AC ¶ 70). Although Plaintiff insisted that she had enough after that, Combs pressured her to imbibe more alcohol and marijuana by telling her that she was acting too uptight. (AC ¶ 71). Plaintiff felt as if she was floating. (AC ¶ 72). Although Plaintiff had smoked marijuana in the past, she had never experienced such a disorienting feeling after smoking and has not since that night. (AC ¶ 73). Plaintiff would not have ingested the joint if she had known that Combs had laced it. (AC ¶ 74). In providing Plaintiff with a laced joint and/or intoxicating substance, Combs involuntarily drugged her. (AC ¶ 75 ).

Seeing Plaintiff was very intoxicated, Combs demanded Plaintiff follow him and he physically led Plaintiff to the bathroom that adjoined the Demo Room.  (Id.). The bathroom had a frosted, semi-transparent glass pane which allowed occupants of the Demo Room to see activity within the room.  (AC ¶ 76).

In the bathroom, Combs forced himself on Plaintiff and began kissing her without her consent.  (AC ¶ 77). Combs, then, shoved her head down to his crotch before commanding her to "suck it."  (AC ¶ 78). Plaintiff refused, but Combs pushed her head down onto his phallus and forced her to perform oral sex on him. (AC ¶ 79). As she was being assaulted, Plaintiff felt panicked and physically sick.  (AC ¶ 80). Afterwards, Combs led Plaintiff back into the studio. (AC ¶ 81).

Upon standing and walking, Plaintiff felt more and more woozy and then lost consciousness. (AC ¶ 82). Plaintiff awakened in shock to find herself in a taxicab heading back to the Designer's apartment. (AC ¶ 83). As her consciousness returned, Plaintiff realized that she had been sexually assaulted by Combs. (AC ¶ 84). Plaintiff felt humiliated and traumatized and without recourse. (AC ¶ 85). Upon information and belief, Combs purposely assaulted Plaintiff so others could see it in a voyeuristic display for his associates and others present. (AC ¶ 86). A prominent music industry professional who worked for Bad Boy was present that night and witnessed the events as described herein. (AC ¶ 87).

### D. Combs' Assault Has Caused Plaintiff Lifelong Harm

Following the assault, Plaintiff's modeling opportunities quickly began to dwindle and then evaporated entirely. (AC ¶ 88). Upon information and belief, Combs had Plaintiff "blackballed" in the industry and utilized his significant influence to impede Plaintiff's career growth. (AC ¶ 89). Plaintiff became severely depressed as she began to blame herself for the assault and for sabotaging her own career. (AC ¶ 90). The assault led Plaintiff into a tailspin of anxiety and depression. (AC ¶ 91). In or about 2004, Plaintiff attempted suicide and was hospitalized. (AC ¶ 92).

Everywhere Plaintiff looked, she was reminded of Combs' assault, as Combs was an inescapable presence in music, television, and film. (AC ¶ 93). In the ensuing years, Plaintiff has also experienced alcohol and drug addiction, as she attempted to cope with the emotional trauma of being assaulted. (AC ¶ 94). Plaintiff has also experienced intimacy issues, as she struggles to maintain emotional and sexual relationships with men. (AC ¶ 95). Plaintiff was married from approximately 2006 to 2010; however, her marriage fell apart as she had a mental breakdown precipitated by memories of the assault. (AC ¶ 96). Combs' assault has altered the trajectory of Plaintiff's career, denying her a successful and lucrative career in the modeling and film industries.

(AC ¶ 97). To this day, Plaintiff experiences bouts of depression, anxiety, body image issues, feelings of worthlessness, and intimacy issues because of Combs' assault. (AC ¶ 98).

**E.  Corporate Defendants Are Liable For Combs' Behavior**

Corporate Defendants knew, should have known and/or had actual and constructive notice of Defendant Combs' propensity for sexually harassing, assaulting, and/or drugging women.  (AC ¶ 102). Upon information and belief, Combs' propensity for violence was an open industry secret. (AC ¶ 103). Upon information and belief, industry professionals regularly discussed that Combs engaged in forceful sex with women and made promises of career advancement. (AC ¶ 104).

In a May 28, 2024, article, Rolling Stone reported on several violent acts allegedly committed by Combs prior to his assault of Plaintiff.  (AC ¶ 105). Rolling Stone reported that Defendant Combs publicly beat his then-girlfriend while he was a student at Howard University in approximately 1989 or 1990. (AC ¶ 106). Combs' propensity for violence was not a secret, as he allegedly told Jet Magazine: "I had a temper. That's why my friend started calling me Puffy." (AC ¶ 107). Indeed, Combs released his first single in 1996 utilizing the stage name "Puff Daddy" – seven years prior to his assault of Plaintiff. (AC ¶ 108).

That same year, Combs allegedly threatened Kirk Burrowes, former president of Bad Boy Records, with a baseball, as detailed in the Rolling Stone article and a 2003 lawsuit. (AC ¶ 109). Rolling Stone also reported that Burrowes witnessed Combs attack a woman at the Bad Boys office in 1994. (AC ¶ 110). In 2000, according to Rolling Stone, Combs allegedly approached a Bad Boy employee named "Anna" and began to massage her shoulders without her consent and allegedly approached her boss to solicit Anna for sex. (AC ¶ 111). Lawsuits by Liza Gardner and Joi Dickerson-Neal also detail sexual assaults committed by Combs in 1990 and 1991. (AC ¶ 112).

Given the above-referenced acts, Corporate Defendants were on notice of Combs' violent behavior and negligently placed him and/or allowed him to remain in positions of power where he

could engage in sexual and/or violent misconduct. (AC ¶ 113). Defendants Bad Boy, Sean John, and Daddy's House allowed Defendant Combs to remain in leadership positions such as CEO, which allowed him access to victims such as Plaintiff, which he sexually assaulted. (AC ¶ 114).

### III.   LEGAL STANDARD

"[W]hen considering a preemption argument in the context of a motion to dismiss, the factual allegations relevant to preemption must be viewed in the light most favorable to the plaintiff. A district court may find a claim preempted only if the facts alleged in the complaint do not plausibly give rise to a claim that is not preempted." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015).

In considering the retroactivity and corporate liability arguments on a Motion to Dismiss, the Court "must accept all factual allegations in the complaint as true, and all reasonable inferences drawn in favor of the plaintiff." *Mujo v. Jani-King Int'l*, 13 F.4th 204, 208 (2d Cir. 2021). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). In assessing, the court should not "assay the weight of the evidence which might be offered in support" of a claim. *Schafer v. Direct Energy Servs., LLC*, 845 F. App'x 81, 82 (2d Cir. 2021).

### IV.   ARGUMENT

Defendants' primary argument is that the GMVA is preempted by the Child Victim's Act ("CVA"), C.P.L.R. § 214-g and the Adult Survivor's Act ("ASA"), C.P.L.R. § 214-j,  They assert that there is both 1) field preemption as the state enacted "a comprehensive state-wide statutory scheme," and (2) conflict preemption as the GMVA is in "direct conflict with the ASA's and CVA's mandates." (ECF No. 33, p.5, 7). Defendants additionally claim exemption from the GMVA revival window and that they cannot be held liable for the sexual violence against Plaintiff because they, as Corporations, did not directly commit the assault. All three arguments are futile.

7

A. __Relevant History of the GMVA, CVA, And ASA__

The GMVA was passed in 2000 to "provide[] a civil cause of action for victims of crimes of violence committed because of gender…" *Breest v. Haggis*, 180 A.D.3d 83, 85 (App. Div. 2019, 1st Dep't). A crime of violence is "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law… if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction." N.Y.C. Admin. Code § 10-1103.  Although the GMVA initially required claims to be filed "within seven years after the alleged crime of violence motivated by gender occurred," in 2022, the NYC Council passed a revival window allowing for plaintiffs to file previously time-barred GMVA claims until March 01, 2025. *Stein v. Rockefeller Univ. Hosp.*, 2024 NYLJ LEXIS 1662 at *4 (Sup. Ct. N.Y. Cnty. May 23, 2024). Plaintiff commenced this action on May 21, 2024, within the statutory revival window.

In contrast, the Child Victim's Act ("CVA"), C.P.L.R. § 214-g, was passed by the New York State Legislature creating a revival window from August 14, 2019, to August 14, 2021, allowing for a "window in which adult survivors of child sexual abuse would be permitted to file civil actions, even if the statute of limitations had already expired…" *Doe v. Wilhelmina Models, Inc.,* 229 A.D.3d 128, 143 (App. Div., 1st Dept 2024), *quoting* Senate Introducer's Mem in Support of 2019 NY Senate Bill S2440). Following suit, the Adult Survivor's Act ("ASA"), C.P.L.R. § 214-j, was passed by the New York State legislature to create a revival window from May 24, 2022 to November 24, 2023 for adults who suffered sexual abuse, "for the revival of otherwise time-barred civil claims arising out of sexual offenses…Those who have had justice denied them as a result of New York's formerly insufficient statutes of limitations…[were] given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law."

C.P.L.R. § 214-j; 2021 N.Y.S.B. 66 (NS), New York Committee Report, December 31, 2020.

### B.  Defendants Fail to Address Controlling Precedent

Defendants' preemption argument contradicts binding precedent. In *Engelman,* the Appellate Division rejected a near identical preemption argument – that the GMVA is preempted by CPLR 215(3) which created a one-year statute of limitations for assault and battery claims. *Engelman v. Rofe,* 194 A.D.3d 26 (App. Div. 1st Dep't 2021). The Court made clear that the GMVA is an independent civil rights cause of action, thus, it was not preempted by the CPLR's statute of limitations:

> "[T]he legislative intent of the "VGM [a/k/a GMVA] was to create a civil rights remedy or cause of action such as in VAWA, rather than to extend the statute of limitations for a particular class of assaults. Since the nature of the claim is for a civil rights violation (providing a remedy for those subjected to violence because of their gender), the seven-year limitations period provided in the Administrative Code is not preempted by the CPLR statute of limitations for assault claims."

*Id.* at 25-26. Upholding the validity of the GMVA, the Division held that "[t]he VGM's [a/k/a GMVA's] construct [was] consistent with the City's 'broad policing power' to enact legislation to protect its residents from discrimination, including gender-related violence." *Id.* at 31. In reaching its conclusion, the Appellate Division held that in passing the New York State Human Rights Law, "the State has not preempted local anti-discrimination laws of general application [such as the New York City Human Rights Law] …" *Id.* at 31-32. Thus, the Appellate Division ruled that the CPLR did not preempt the GMVA.

### C.  There is No Evidence That the State Intended to Preempt the GMVA and It Has Not Set Out a Statutory Scheme To Do So

Field preemption prohibits a local government from legislating in a field or area of the law where the [l]egislature has assumed full regulatory responsibility." *Police Benevolent Ass'n of the City of N.Y., Inc. v. City of N.Y.*, 40 N.Y.3d 417, 423 (NY 2023). "Intent to occupy a field to the

exclusion of local legislation can be implied from a declaration of state policy, the State's enactment of a comprehensive and detailed regulatory scheme in a particular area." *Id.* at 424. However, "the mere fact that a local law may deal with some of the same matters touched upon by [s]tate law does not render the local law invalid." *Id.* at 425.

In *Engelman*, the Court explicitly rejected a defendant's argument that the CVA field preempted state law, as "New York State has not evinced an intent to occupy the field with respect to the statute of limitations in this matter." *Engelman*, 194 A.D.3d at 30.

In *Doe v. Gooding,* this Court applied *Engelman,* as it is "the only Appellate Division to have considered the issue, and there is no indication that New York's Court of Appeals would decide otherwise." 2022 U.S. Dist. LEXIS 68607, at *6 (S.D.N.Y. Apr. 13, 2022). This Court found that "local antidiscrimination laws are generally not preempted by state law in New York" and that the "[t]he VGM has been on the books for over two decades since its passage in 2000, and Defendant has identified nothing that the state legislature has done during those decades— either expressly or implicitly—to preempt the VGM's statute of limitations or bring it under the ambit of the CPLR." *Id.* at 6. Ultimately, the Court denied Defendant's Motion to Dismiss, allowing the plaintiff to litigate her claims. *Id.* at *19-*20.

In *Doe v. Black*, this Court again rejected the exact argument that Defendants make here: that New York State law preempted the GMVA. 2024 U.S. Dist. LEXIS 175929 (S.D.N.Y. Sep. 27, 2024). In *Black*, the Court found that the state did not indicate an intent to occupy the field as "the CVA does not come close to enacting a comprehensive scheme," as "[t]he state did not create a commissioner or board with investigatory or enforcement power. The state did not impose direct controls at the local level. The state did not set forth comprehensive procedures for administrative and judicial review. Simply put, there is no detailed and comprehensive scheme." *Id.* at 15. The

10

Court found that the CVA merely contained "general statements about helping all New Yorkers," in comparison to legislation where the "state has expressed a need for complete control in a field" such as state zoning and alcohol beverage control laws. *Id.* at *10-12.

Instead of meaningfully addressing *Doe v. Black*, Defendants bury its contrary holding in a footnote (ECF No. 33, p.8).  Defendants rely on inapposite cases in which the state explicitly stated its intent to overrule local legislation. *See Terrance v. City of Geneva*, 799 F. Supp. 2d 250, 256 (W.D.N.Y. 2011) (holding that the state preempted local legislation where the legislative bill explicitly stated that the state had exclusive jurisdiction over housing policies for sex offenders); *Albany Area Builders Ass'n v. Guilderland*, 74 N.Y.2d 372, 378 (1989) (holding that state law explicitly limited town funding of highways, and thus, a town could not develop its own budgetary procedures).

As this Court has already ruled, the state has not "expressly or implicitly" preempted the GMVA. There is no evidence that "indicates a desire…to assume full control or regulation of this issue." *Gooding,* 2022 U.S. Dist. LEXIS 68607 at *6 (S.D.N.Y. Apr. 13, 2022); *Black*, 2024 U.S. Dist. LEXIS 175929 at *12 (S.D.N.Y. Sept. 27, 2024). Defendants' field preemption argument must fail.

### D.  <u>There Is No Conflict As The GMVA Furthers the Same Goals As the CVA and ASA</u>

"Conflict preemption exists where there is a head-on collision between the local law and the state law." *Black*, 2024 U.S. Dist. LEXIS at *17. Courts must approach the issue cautiously as "reading conflict preemption principles too broadly carries with it the risk of rendering the power of local governments illusory, [as] [t]he fact that both the [s]tate and local laws seek to regulate the same subject matter does not in and of itself give rise to an express conflict." *Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 184 A.D.3d 197, 203 (App. Div., 1st Dep't

2020), *citing* 31 NY3d 601 (NY 2018).

Applying *Engelman* the Court has repeatedly determined that there is no conflict between the GMVA and the CVA. The GMVA is a separate civil rights cause of action, in contrast to the CVA which was passed to "extend the statute of limitations for a particular class of assaults." *Gooding,* 2022 U.S. Dist. LEXIS 68607 at *5.  The GMVA "does not curtail or take away a right or benefit expressly given by the state" and the GMVA "does not act to prevent anyone from filing a claim under the CVA." *Black,* 2024 U.S. Dist. LEXIS 175929 at *17. There can be no collision where both laws "serve the same purpose" of allowing victims of assaults to seek justice after being assaulted. *Id.* at 18.

In light of such well-reasoned precedent, Defendants' reliance on *Bellino v. Tallarico* is misplaced.  2024 U.S. Dist. LEXIS 56345 (S.D.N.Y. Feb. 21, 2024). The case is an outlier. *Bellino* is an unpublished decision reached on an unopposed Motion to Dismiss. In *Bellino,* the Court had to decide on the legitimacy of assault allegations that occurred about 25 years prior to the enactment of the GMVA. *Id.* at *1-*2. Noting that the "[t]his action would be untimely," the plaintiff's claims were found to be time barred. *Id.* at *2. Here, no such issue exists as Plaintiff's claims accrued in 2004, after the passage of the GMVA in 2000.  Aware of the *Bellino* ruling, this Court has already refused to adopt its rulings, finding its analysis to be unpersuasive.

As statutes should be interpreted "to effectuate the intent of the Legislature," a sworn affidavit from the co-author and sponsor of the CVA is highly relevant. *People v. Brown,* 25 N.Y.3d 247, 250 (2015). In a September 26, 2024, NY Senator Brad Hoylman-Sigel, Chairman of the Committee on the Judiciary, attested that [2]: "The plain language of the CVA makes clear that the legislative intent in August 2019 was, and remains, not to preempt other laws. This includes

---

[2] Senator Hoylman's affidavit was filed in *Doe v. Black,* 1:23-cv-06418 (ECF No. 105), and is attached as Exhibit A for ease of access.

the VGMPL [a/k/a GMVA], which was enacted and in place years prior to the enactment of the CVA." **(Exhibit A)**.[3] New York State Senator Hoylman-Sigal's testimony is important as he was the Chairman of the Committee on the Judiciary during the legislative session in which the CVA was introduced and signed into law. It was the Senator's responsibility "to move the legislation through [the] committee and get it on the floor for consideration," thus, his affidavit is further evidence that the legislative intent behind the CVA was not to preempt the GMVA. Diane Piappert, *2024 Barbara Blaine Trailblazer Award Recipient – NY State Senator Brad Hoylman-Sigal*, CHILDUSA (Oct. 15, 2024), accessible at: https://childusa.org/2024bradhoylman-sigal/.

E. **The Corporate Defendants Are Liable Because the GMVA's 2022 Amendment Is Applied Retroactively**

Defendants argue that they cannot be held liable under the pre-amendment GMVA, and thus, such claims must also fail under the statute post-amendment. (ECF No. 33, p. 9). Yet, a court must "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Doyon v. U.S.*, 58 F.4th 1235 (Fed. Cir. 2023), *quoting* 416 U.S. 696, 711 (1974). As the amended statute unambiguously extends liability to "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence," Plaintiff's claims are viable because the amendment is retroactive. N.Y.C. Admin. Code § 10-1104.

Although Defendants allege that there is a presumption against retroactivity, courts have held that "remedial legislation should be given retroactive effect in order to effectuate its beneficial purpose." *Matter of Gleason*, 96 N.Y.2d 117, 122 (2001). "Remedial statutes are those designed

---

[3] "[U]nder Rule 201(b) of the Federal Rules of Evidence, a court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).

to correct imperfections in prior law, by generally giving relief to the aggrieved party." *Nelson v. HSBC Bank USA*, 87 A.D.3d 995 (App. Div. 2d Dep't, 2011).  In determining if a statute should be applied retroactively, courts examine whether "the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." *Gleason*, 96 N.Y.2d at 122.

Here, the City Council conveyed a sense of urgency as it introduced the GMVA nine days after the decision in *U.S. v. Morrison,* which struck down the Violence Against Women Act, as "[i]n light of the void Supreme Court's decision, this Council finds victims of gender-motivated violence should have a private right of action against their perpetuators." New York City, Local Law Report No. 752-A (2000) **(Exhibit B)**. Furthermore, the City Council's enactment of the GMVA and its 2022 amendment went into effect immediately. **(Exhibit B/Exhibit C).** New York City, Local Law Report No. 752-A (2000) § 2; New York City, Local Law Report No. 2372-2021 (2021) § 2. *See Bayview Loan Servicing, LLC v. Dalal,* 2024 N.Y. App. Div. LEXIS 6154 (App. Div. 1st Dep't, Nov. 19, 2024) (finding that a statute was retroactive, as it was remedial in nature and utilized 'take-effect-immediately' language"); *accord U.S. Bank v. Lynch,* 2024 N.Y. App. Div. LEXIS 5578 (App. Div. 3d Dep't, Oct. 24, 2024); *Matter of NYP Holdings, Inc. v. N.Y.C. Police Dep't*, 220 A.D.3d 487 (App. Div. 1st Dep't 2023).

In addition, written testimony submitted to the New York City Committee on Women and Gender Equality further support that the 2022 amendment was intended to apply retroactively. New York City, Local Law Report No. 2372-2021 (2021) (Hearing Testimony Nov. 29, 2021) **(Exhibit D).**  One survivor testified that a failure to pass the law would "only help criminals **and**

**those who facilitated those crimes**," another testified that "[a] one year statute of limitations for filing civil suits in sex crime cases makes so little sense it seems a giveaway to serial perpetrators **and the institutions that shield them**," several survivors testified about how "**Columbia Presbyterian allowed** [Dr. Robert] Hadden to continue practicing for 19 years" despite 175 complaints of sexual assault (*Id.* at p. 39, 41, 51, 57, 58, 59 emphasis added). Thus, the amendment was enacted to ensure individuals could pursue claims against corporate entities who enable abuse regardless of when it occurred.

To support its arguments against retroactivity, Defendants speciously cite to cases where the allegations of assault that predate the enactment of the GMVA in 2000. *Louis v. Niederhoffer,* 2023 U.S. Dist. LEXIS 227003, at *2 (S.D.N.Y. Dec. 19, 2023) (granting a Motion to Dismiss where allegations stemmed from events in 1974-1979); *Bellino*, 2024 U.S. Dist. LEXIS 56345 at *1 (granting a Motion to Dismiss where allegations stemmed from events in 1975); *Bensky v. Indyke,* 2024 U.S. Dist. LEXIS 138140 (S.D.N.Y. Aug. 05, 2024) (granting a Motion to Dismiss where allegations stemmed from events starting in 1995). Under those circumstances – where a claim occurs prior to the existence of a law, a valid claim cannot be sustained. Because Plaintiff's sexual assault occurred in 2004, after the passage of the GMVA in 2000, the Corporate Defendants cited cases are unavailing.

A remedial statute is "intended to correct what the legislature viewed as deficiencies in the prior law." *Zhang v. Centene Mgmt. Co.,* 2023 U.S. Dist. LEXIS 68718, at *37 (E.D.N.Y. Feb. 2, 2023). Since the GMVA was amended to address its prior limitations, it is appropriately retroactive.

**F.  <u>The Corporate Defendants Are Liable Because They Enabled Combs' Sexual</u>**
   <u>Assault</u>

The Corporate Defendants also assert that they cannot be held liable under the GMVA, essentially because Plaintiff does not allege that they directly committed the assault.  (ECF No. 33, p.19).  Defendants' position, that an employer must affirmatively act to impute liability for an employee's assault, ignores a clear reading of the statute. The GMVA creates liability for "a party who commits, directs, ***enables***, participates in, or conspires in the commission of a crime of violence." N.Y.C. Admin. Code § 10-1104. (Emphasis added).

Courts frequently find corporate liability where "the employer had actual or constructive knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm; (2) the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control; and (3) the employee engaged in tortious conduct on the employer's premises or using property or resources available to the employee only through their status as an employee…" *Moore Charitable Found. v. PJT Partners, Inc.,* 40 N.Y.3d 150, 157 (2023). "The employer's negligence lies in having placed the employee in a position to cause foreseeable harm, harm which would most probably have been spared the injured party had the employer taken reasonable care in making decisions respecting the hiring and retention of the employee." *Druger v. Syracuse Univ.*, 207 A.D.3d 1153, 1154 (App. Div. 4th Dept. 2022) (denying Motion to Dismiss on a negligent hiring and retention claim where an employer "knew or should have known about the employee's propensity" to engage in sexual abuse); *see also Brown v. Univ. of Rochester*, 216 A.D.3d 1328, 1332(App. Div. 3d Dept. 2024) (denying Motion to Dismiss where there were allegations that the university had received "ongoing and pervasive criminal conduct and had a "legal duty to take appropriate responsive action.").

Plaintiff has sufficiently pled facts that support the Corporate Defendants' liability under the law. Plaintiff alleges that the Corporate Defendants had actual or constructive knowledge of Combs' propensity to sexual assault women, as it "was an open industry secret," and "industry professionals regularly discussed that Combs engaged in forceful sex with women and made promises of career advancement." (AC ¶ 103-104). Indeed, Plaintiff has referenced just some of the publicly known acts of abusive conduct against women, including Combs "publicly beat[ting] his then-girlfriend" in approximately 1989 or 1990, "attack[ing] a woman at the Bad Boy Offices in 1994," and massaging a female employee without her consent, and then soliciting that employee for sex in 2000." (AC ¶ 105-110). Combs even admitted his propensity for violence, proudly proclaiming: "I had a temper. That's why my friends started calling me Puffy." (AC ¶ 107). Combs' violence and abuse of women was so open and notorious that Corporate Defendants cannot credibly claim that they did not know (or should not have known) of his frequent illegal conduct against women.

Plaintiff's allegations also show how Combs utilized his elevated status and abundant resources as an employee to facilitate his sexual assault of Plaintiff. For instance, "as CEO and president of the [Sean John] company, Defendant Combs was representing the company when he attended the Men's Fashion Week dinner where he met Plaintiff." (AC ¶ 32). As CEO, Defendant Combs manipulated Plaintiff by telling her that "he had power in the industry and was going to help her advance her career." (AC ¶ 42, 54). Combs provided his phone number to Plaintiff under the auspices of career mentorship. (AC ¶ 55). Later that evening, Combs invited Plaintiff to meet him at his recording studio Defendant Daddy's House, where he was producing an album for Defendants Bad Boy. (AC ¶ 61-62). At the Studio, Defendant Combs and Defendants Bad Boy's employees plied Plaintiff with alcohol and provided her a laced joint narcotic. (AC ¶ 65-75).

17

Subsequently, while Defendant Combs sexually assaulted Plaintiff in the studio's restroom that had semi-transparent glass, the employees could see what happened and failed to report it. (AC ¶ 75-79).

Plaintiff's case mirrors that of *Ormond v. Weinstein*, in which the Court found that Harvey Weinstein's assault of an actress could be imputed to his employer *Miramax*. 2024 N.Y. Misc. LEXIS 22470 (Sup. Ct. N.Y. Cnty. Aug. 19, 2024). In *Ormond,* the plaintiff met with Weinstein for dinner to discuss him financing her upcoming film, and afterwards, he assaulted her at a company-owned apartment. *Id.* at 7. The Court found that allegations that Weinstein's propensity of sexual violence was known to Miramax officers, as well as Weinstein's promises of career advancement, and his utilization of a company-owned apartment were sufficient to pled negligent supervision and retention. Ultimately the Court held that "Weinstein used his position at Miramax [as an officer of the studio], and his power to greenlight financing on her project per her film production agreement with Miramax, to facilitate his assault on her." *Id.* at 7. Like Weinstein, Combs' history of sexual violence was well-known or should have been known by a prudent employer. The Corporate Defendants provided the necessary resources to Combs to coerce Plaintiff with promises of advancing her career and utilized the company premises to carry out his illegal acts. Thus, the Corporate Defendants are liable for enabling Defendant Combs' sexual assault.

Defendants make a last-ditch effort to dismiss Plaintiff's matter, by arguing they are not liable because sexual misconduct was outside the scope of Combs' employment. (ECF No. 33, p. 21). How Combs regularly utilized his affiliation with Corporate Defendants and his status as their employee to further his sexual assaults, is detailed in several publicly filed lawsuits. The glaringly similar allegations demonstrate his pattern and propensity for sexual violence.

18

- In *Jane Doe v. Sean Combs, et. al.*, 23-cv-10628 (S.D.N.Y., filed Mar. 29, 2024) (ECF No. 52), Jane Doe alleged that in 2003, Defendant Combs and a Bad Boys Executive lured the plaintiff to Daddy's House Recordings Studio by discussing their affiliation with Bad Boy Records. At the Studio, Defendant Combs plied Jane Doe with drugs and alcohol before sexually assaulting her in the same bathroom where Plaintiff was assaulted in 2004.

- In *Graves v. Combs, et. al.*, 1:24-cv-07201 (S.D.N.Y., filed Sept. 24, 2024) (ECF No. 1), Ms. Graves alleged that in 2001, Defendant Combs lured her to Daddy's House Recordings Studio to discuss her boyfriend's, a Bad Boys employee, performance issues. On the way to Daddy's House, Defendant Combs involuntarily drugged Ms. Graves, before sexually assaulting her. Again, this is the same studio where Plaintiff was drugged and sexually assaulted as well.

- In *Ventura v. Combs,* 23-cv-10098 (S.D.N.Y., filed Nov. 16, 2023) (ECF No. 1), Ms. Ventura alleged that Defendant Combs signed her to Defendant Bad Boy Records in 2005 or 2006 and lured her into a relationship by making promises to advance her career. Thereafter, Ms. Ventura was repeatedly drugged and sexually assaulted by Defendant Combs. Bad Boy Records executives were aware of Defendant Combs' sexual abuse and violence. and impeded Ms. Ventura's efforts to extricate herself from the situation.

- In *Lampros v. Combs, et. al.*, 15489/2024 (Sup. Ct. N.Y. Cnty. May 23, 2024) (NYSCEF No. 1), Ms. Lampros alleged that beginning in 1994, Defendant Combs promised to mentor her to further her dreams of working in the fashion industry, and to introduce her to executives to aid her job search. Ms. Lampros alleged that

19

Defendant Combs repeatedly used promises of career advancement to facilitate his forced drugging and sexual assaults of her.

Plaintiff sufficiently pleads how the Corporate Defendants were or should have been aware that Defendant Combs utilized their resources to lure and sexually assault women, often on company premises, establishing the Corporate Defendants' liability under the GMVA.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion be denied in its entirety.

Dated: New York, New York
December 6, 2024

Respectfully submitted,

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By: _____

Michelle A. Caiola, Esq.
Jonathan Goldhirsch, Esq.
*Attorneys for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248-7431
F: (212) 901 - 2107
mcaiola@tpglaws.com
jgoldhirsch@tpglaws.com